Junior at all versus P.W. at all. Mr. Schmidt, are you ready to proceed? Yes, I am. Thank you, Mr. Chief Justice, and may it please the court. My name is John Schmidt. I'm from the Office of the Attorney General, and I represent the people of the state of Illinois.      Thank you. Thank you. Thank you. Thank you. Thank you. This is a case in which the circuit court adjudicated that two children, Aaron Junior and Alice, were neglected based upon injurious environment. And that adjudication resulted from a number of incidents in which their father displayed extreme anger and hostility toward others. The appellate court majority reversed on two grounds. The first one being that the majority felt that incidents that happened outside the presence of the children should not have been considered at all. And then when only the incidents that took place in front of the children were considered, the majority felt that the evidence was not sufficient to sustain the finding of neglect based upon injurious environment. Just as Holdridge dissented, he would have considered all of the evidence of all of the incidents in question, which is what the circuit court did. And he felt based on the totality of the circumstances that the circuit court's decision was not against the manifest weight of the evidence. The appellate court majority relied largely on two decisions, one of which was the appellate court JP decision. But that decision out of the first district really supports the state because that's a decision in which an injurious environment determination was based largely upon incidents in which the father exhibited a bad temper, made threats to DCFS personnel and hospital workers, and some of those incidents did happen outside the children's presence and were indeed taken into account. The appellate majority also relied very much upon this court's prior decision in the NB case, a 2000 case in which there were two, which involved two outbursts of anger by a mother, both directed at personnel from a county health agency. But we believe that NB also provides support for the state's position because this court emphasized in NB the three things were not present that are present here. The first would be a lack of evidence in NB that the mother's anger blinded her to the interests of the children. Indeed, in NB, in a sense, in the first angry incident, she could be seen as defending her children's interests. Although her behavior was certainly inappropriate, she was upset that she was not able to get regular milk for them. Here we have angry displays by the father on several occasions that show that his anger would blind him to the children's interests. Assaulting his own sister in front of the children, punching her, was certainly not in his children's interests. That would be highly traumatic for children to see. It's also an example of, it also sets a very poor example for his children. And also the incident in which he met with his son's principal to discuss the suspension, ended up cursing, throwing the suspension notice across the hallway, or across the room, and then being escorted out by a police officer. He had brought there for some unknown reason. That's, again, that was in front of his son. That's setting a very poor example. And it even goes beyond that because soon after that, about three weeks later, his son ends up being pulled out of school. So instead of trying to resolve his son's disciplinary problems, the father, Aaron Sr., is allowing his anger to cause him to make a decision that's not rational and not good for his son's interests. We have also the two incidents in which the children were missing. And in one instance, they were at the grandfather's house. So the grandfather and the sister came by to notify Aaron Sr. where the children were and to find out what's going on. Why did they run off? And Aaron Sr.'s first reaction is to curse and to try to get into a fight with his father, which fortunately was broken up. But again, he's not, he's allowing his anger to blind him to what is good for the children. The same was true a few days later when he thought his son was back at the grandfather's house. And he ends up throwing a fit and cursing at a police officer who is there to help him because the police officer is trying to elicit information. He ends up throwing his cell phone and smashing it against a garage. And it turned out his son wasn't even present. So you have numerous instances where the anger is showing that Aaron Sr. is blinded to his children's interests. You also, NB mentioned that there was no evidence of physical assaults. Well certainly that's not the case here. There was of course the assault by Aaron Sr. against his own sister in the children's presence. Ten years earlier, Aaron Sr. had brutally beaten his mother. Now granted, that incident was quite remote in time. But it provides a backdrop that shows that when this man's anger gets out of control, terrible consequences can ensue. And there was evidence of course that his anger was getting out of control a number of times within the space of a year. And also in NB, this court emphasized there was a lack of frequency of anger, which is not the case here. Here there were two incidents in NB. Again, both directed at the same county health agency. Here there were eight within a year. And they were directed against a multiplicity of targets. Often against people who were trying to help Aaron Sr. In several instances against police officers. And somebody who's going to behave that way toward a police officer. I would think there's a risk that if he loses control in front of a police officer, it's not likely he would hesitate to do so in front of children. And we also have evidence in this case that the anger was affecting the children. Especially the incident I discussed where Aaron Jr. is being removed from school. But also Aaron Jr. had made a statement to a DCFS case worker who became involved. That to the effect that his father had often been angry in the past year. That's corroborated by Jetan Woods, Aaron Sr.'s sister, who said that her brother had been a good person. A very loving, good man. But at the time of the assault, he changed. And since then had been a very angry and confused man. And also Aaron Sr.'s father, John Gingery, said that about the same time these other things were happening, Aaron Jr. threatened him and the two stopped speaking to each other. Mr. Schmidt, in this court considering the issue of whether it was proper for the trial court to consider the events that took place outside the presence of the children, what is the standard of review? It would be an abuse of discretion standard. Because I would say that that's a question of whether the evidence was relevant and courts apply the abuse of discretion standard to relevance. The appellate courts seem to feel that NB required this evidence to be disregarded. I think NB is better seen as a sufficiency of the evidence case. NB looked at the evidence that was presented and said, and the court concluded, that's not enough. And one other important factor in NB was there was a DCFS caseworker testifying in that case, but that caseworker said the mother was being cooperative with DCFS. The mother was meeting regularly with DCFS caseworkers, and the caseworker had observed interaction between the mother and the children and found, yes, the mother occasionally became frustrated with the children, but no more so than other parents would, and the mother's behavior toward the children was appropriate. In contrast to that cooperative mother, in this case you have an uncooperative mother and father. Both of them originally agreed in mid-March of 2006 that, yes, we'll accept DCFS services. I believe the main concern then was their son was not in school. The daughter was, but the son was not going to school. But a few days later, the DCFS caseworker shows up to inquire and to get the services going and is thrown off the property and told to go get counseling herself. And there was a later family meeting, too, that DCFS arranged with the adult members of Aaron Sr.'s family, yes, of Aaron Sr.'s family, but that broke down as well. And after that, both parents simply refused to cooperate at all with DCFS. So I think that's another striking contrast between the two cases, and that's another example of the children's interests being disregarded when there's a situation where I believe obviously some help was needed for these parents. There were issues with these parents that needed to be addressed. So that's another very important factor that distinguishes these two cases and that would justify upholding the circuit court's decision. As I stated in my answer to Justice Garmon, the abuse of discretion standard of review would apply in determining what evidence could properly be considered. And I think when this case is examined as a whole, when the totality of circumstances are taken into account, as Justice Holdridge felt should have been done, it can't be said that it was an abuse of discretion to consider evidence of incidents that happened outside the children's presence, especially when some of them, even though they happened outside the children's presence, were relating to the children, like the incidents in which one or both children were missing and they were seeking to be found. And also when the evidence as a totality shows a person whose temper was out of control to the extent that his anger was directed at the multiplicity of targets, again, unlike the situation in NB. And the manifest way to the evidence standard applies, of course, to the ultimate determination of neglect. And certainly we believe this is a much stronger case for neglect than NB was. And in this case, the trial court's determination was not against the manifest way to the evidence. I think one other important thing to emphasize is that there is a distinction between the neglect adjudication and between the evidence necessary to terminate parental rights. A court would need clear and convincing evidence to do that. Here the preponderance of the evidence standard is applicable. So it is not as high a hurdle for the state to meet. For the reasons I've stated, we would ask that the appellate court majority's decision, well, it's two decisions, that they both be reversed and that the circuit court's finding of neglect be reinstated. Thank you, Mr. Schmidt. Ms. Kelly? Good morning. May it please the court. I represent the respondent mother. She goes by Phoenix Wilson. I'm here on behalf of the Public Defender's Office of Peoria County. I believe that the state is correct that the abuse of discretion standard does apply. But what's different about this case is that it is not the typical injurious environment case that you would normally see in Peoria County. It's got some components that you see, but not all of them. Typically the injurious environment cases that we see in Peoria County are long-standing patterns of domestic violence, not just one incident that took place over 10 years ago. Or you see evidence of diagnosed mental health issues, which you do not have here. There is no evidence in the record that shows that either father or mother suffers from any legitimate or diagnosed mental health issues. You also don't have any evidence of drug and alcohol abuse, which would be the normal case in Peoria County. What you see here is just the anger that often accompanies some of the other classic cases and supports petitions, but in and of itself does not usually drive a neglect petition. And in this case, I think that the 3rd District correctly observed that over half of the incidents that were alleged took place outside of the presence of the children. Being stopped by a police officer for not having your seatbelt on when no children are present, when you're in a low-income neighborhood and you're African American and the police officer is white, would be aggravating. And whether his conduct was appropriate or not is really not the question. The question is whether or not there's a connection between that behavior and him putting his children at risk, or not providing a safe and nurturing environment for his children. There is no connection between what he did that night and how his children are being raised or protected by him and his wife way over in another part of the city. Similarly, this case does not have a safety plan. That is a typical component of a lot of DCFS cases and a lot of petitions. You see that the parents were cooperating with a safety plan that was put in place by the department. They since breached that and that's what's creating the injurious environment. There was no safety plan in this case. There was a request by the department for the parents to come in and talk about the situation. Their son was not in school. They were going to try to address some issues, some of which included the father's anger, but none of which included an official plan in place that was violated by the parents. So it's one thing to say that they're not cooperating, which they were not, and it's another thing to say that they were not violating a safety plan, which is a whole different set of circumstances. Ms. Kelly, why can't the judge determine which is the relevant evidence and which isn't and look at the totality of the circumstances and make a determination what happened on the other side of town really wasn't relevant to this? Why can't they just look at it all instead of it not being admitted? I think they can. I'm not disagreeing with you on that point. I think that anything and everything can fall into what creates an injurious environment, what meets minimum parenting standards, what doesn't meet minimum parenting standards. Certainly, if you are dealing drugs out of your home and there's a drug raid in your home and your children are present, that's an injurious environment. But if you're using drugs one time recreationally five years ago and you get caught by the police before you've even conceived a child, that's something totally different. If you want to consider that as a pattern of drug use during the course of and leading up to your drug raid, certainly there's a continuum there. But just picking and choosing things that were so far removed and then trying to bundle it up in this case like they did and create an injurious environment is just not enough. I think you can use anything and everything, but you have to be able to show that it's breaching your parental duty. Well, there were some things that were in front of the minor, right? There were. Like the punch of the mother, the punch of the half-sister, what happened at the school. Well, there was the domestic violence from 10 years ago in front of the baby who was Aaron Jr. at that time. That was, I think, correctly weighed as being fairly remote in time. Then there was the incident where dad punched his sister in the presence of the minors. And that certainly, as the third district alluded to, was egregious. But the one incident in and of itself absent all the rest of the things that create the classic injurious environment was not enough. Well, take that one incident by itself and then couple it with the incidents outside of the presence of the minor. I mean, that goes to the cumulative question, right, that was asked. The cumulative question that was asked. And I'm not saying that you can't accumulate all of those things, but in this case, even if you did accumulate all of those things, there is not a sufficient nexus between those things and a breach of the parenting standard and not meeting minimum parenting standards. There are certain... Go ahead. I was just going to say, I want to make sure I understand your position. You're not saying, then, that it was error for the trial court to admit these incidents that occurred outside the presence of the children? No. Okay. Thank you. I think that you can admit those things, but I think that being said, you really do still have to look at the totality of the circumstances to determine whether or not a person is failing to meet minimum parenting standards. I think the court, especially when you sit in juvenile court and you're sitting at the trial level, they hear everything. And you can't discount certain things just because they happened outside the presence and include certain things just because they happened inside the presence of minors. You do have to look at the whole spectrum. But this is not an injurious environment case. This is an angry father. Now that you've said that it was an error to admit this evidence, doesn't the question then become whether the decision of the trial court that the children were neglected, whether that decision was against the manifest weight of the evidence rather than whether it was an abuse of discretion? Yes. Ms. Kelly, once that information is before the court, and I think in this case the appellate court indicated there were maybe two incidents that took place in front of the children other than the remote one of 1995. But there were five or six other incidents of anger or violence outside the presence. Can the court, once that evidence is before it, draw inferences from it that this is a pattern that the father engaged in and would undoubtedly engage in in front of the children? Can a trial judge properly do that? I think a trial judge can properly draw those inferences. I think you're touching on anticipatory neglect, certainly, as in the case of JP. But you can't make gigantic leaps in those inferences. I think this case of anger and maybe some bizarre behavior and maybe some violent and erratic behavior is certainly something that the trial court took into consideration. But that behavior did not then connect to how their children were being harmed, mistreated, or not properly cared for. It's one thing to misbehave out in public. It's one thing to misbehave in social settings. It's one thing to misbehave around adults. But it's another thing to do that at home in front of your children where they're not being cared for properly or being raised in a nurturing environment. And I think that there is not that connection in this particular case. Does anybody else have any questions for me? Counsel, what does the record show, if at all, about the parents' employment? Were they working? This was a situation where the father had recently been terminated from his employment. He used to work in the jail. He used to be a correctional officer and had lost his job and the family was struggling financially. And the record showed that this family, the Wilson family, had supported their extended family during their extended family's periods of trying times financially. But then when it came time for the Wilsons to rely on them, it became not a two-way street. And so they were struggling. The mother has always worked some part-time jobs, burglars, you know, different retail things of that nature. But they were, if not gainfully employed, between legitimate jobs at the time. They were a working family until he was. They were a working family. They had a home. They were married. They were married before they had kids. They were not the classic case that you see in Peoria County Juvenile Court. They were struggling at the time. And I think he was struggling emotionally at the time, but I think that they still were meeting minimum parenting standards. There was no evidence that the kids didn't have food, that they were malnourished, that they weren't being taken to the doctor. One of them was not in school and was struggling in school, was suspended from school, but Elise was in school and was making good grades. They weren't behavior troubles. The mother had no criminal history. It just was some bizarre behavior by the father that when bundled together, still wasn't enough, but apparently the circuit trial judge felt like it was. And they had been sheltered, too, which I think makes a difference. And by that I mean they were sheltered before the petition was filed, and so when the case was pending, there was always this presumption that the kids are not in the home while the petition is pending, which I think makes a difference, too, for the trial judge. Does that conclude your remarks? It does. Thank you. Thank you. Rebella, Mr. Schmidt? Yes, Your Honor. It's true that this isn't a case where there was direct, where there was evidence from a psychiatrist or a psychologist showing mental health issues, but it's very difficult to get that evidence when the parents simply won't cooperate. It's also difficult to find out exactly what's going on in the home when the parents decide that DCF caseworker, DCFS caseworkers won't be allowed to enter and simply shut them out. And I think, I think therefore it shouldn't be surprising that that evidence couldn't be adduced here, but... Mr. Schmidt, at what point in time did DCFS have the right to enter the home to ask for this kind of information? There was some allegation made in the petition, I think, for neglect that the father had failed to comply with DCFS services, but the appellate court found he had no duty to comply. Well, I think... There were no orders in effect directing it to do anything at that point. Is that correct? That's, that's correct. And I think the appellate court's been referring to the period in March of 2006 when DCFS first was called and they were called in after the first of the missing children incidents. And it's not clear who called them. I would surmise that it was probably the police bringing them in or calling them in. At that time, DCFS hadn't filed a neglect petition that had been filed by the state's attorney. So, March 28th, that petition would have been, would have been filed. And then, a few weeks after that, in late April, the court actually ordered that the children could be taken into custody. During the month of April, there were incidents taking place, and the record does reflect this, where DCFS caseworkers were showing up at the house and nobody was answering the door. Aaron Junior later told the caseworker, Raylan Galassi, that they were, the family was indeed home one of those times, but they were told by the parents, he was told by the parents not to answer the door. Technically, at, I suppose at no point would the parents ever be compelled to cooperate, but once a neglect petition is filed, their lack of cooperation runs the risk of, of, you know, having that be taken against them at that,  at that point. And I think even before then, at a period where they had agreed to services and acknowledged a need, and thereby acknowledged a need to address issues, the fact that they subsequently refused to allow DCFS to provide that help, I think that could be taken against them too, and showing, like the March 17th incident where Aaron Senior sent the caseworker away and said, go get counseling yourself, I think that's another showing that he's simply allowing anger to blind him to what's best for his children, and in that situation, what's best for his children is that the parents address their issues, especially Aaron Senior, who had obviously shown some anger issues at that time. And it's also true there was no safety plan in the case. Safety plan is something that the parties must agree to. Parents must agree to it. Early on, they simply agreed that they would accept services, but then steadfastly refused to cooperate with DCFS, so in a situation like that, there's not going to be a safety plan. You can't get the parents to agree, but of course, plenty of abuse and neglect cases do go ahead without safety plans, you know, even if the parents don't agree. And, again, if the court does not have any other questions, we would again ask that the circuit courts find adjudication of neglect be affirmed and that the two appellate court decisions be reversed. Thank you, Mr. Schmidt. Thank you, Ms. Kelly. Case number 105-849 and 105-952 consolidated N. Ray A. W. Jr. et al. versus P. W. et al. is taken under advisement as agenda number 8. Marshal, the Supreme Court